Filed 2/4/22  Song v. Creative Global Investment CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| BRYAN J. SONG,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>CREATIVE GLOBAL<br>INVESTMENT, INC., et al.,<br><br>        Defendants and Appellants. | B299422<br>B301697<br>B304884<br>(Los Angeles County<br>Super. Ct. No. BC638221) |

      APPEAL from a judgment of the Superior Court of Los Angeles County.  Barbara Ann Meiers, Judge.  Affirmed.

      Law Offices of J. P. Pak, J. P. Pak; Benedon & Serlin, Gerald M. Serlin and Kelly Riordan Horwitz for Defendants and Appellants.

      Park & Lim, S. Young Lim and Jessie Y. Kim for Plaintiff and Respondent.

_____

A breach of contract dispute between co-investors in two Coffee Bean and Tea Leaf franchises proceeded to private arbitration, resulting in an award of $132,000 for plaintiff and respondent Bryan Song. Defendants and appellants Dong Yeoun Lee and Creative Global Investment, Inc., filed a petition to confirm the arbitration award, but included requests to have the award clarified and modified. Respondent filed an opposition to the modifications and asked the award to be confirmed.

At the motion to confirm hearing on April 6, 2018, the trial court expressed concerns that the arbitration award contained "serious clarification and/or completeness issues," and subsequently on May 23, 2018, ordered the award vacated and set a date for a de novo bench trial. The trial court's May 23, 2018 minute order states "all parties being in agreement" with the order.

The case proceeded to trial to judgment without objection by any party, resulting in an award of $900,000 in damages and $3 million in punitive damages for Song. After the trial had concluded, appellants filed a motion for a new trial on May 31, 2019, in which the attorney for appellants asserted for the first time that she merely "submitted" to the trial court's insistence on vacating the arbitration award without consulting with her clients.

Appellants appealed from the trial judgment on the basis that the trial court had no authority to set aside the arbitration award and order trial de novo, among other substantive grounds related to the trial judgment.

On the threshold question of whether the trial court had the authority to vacate the arbitration award and order a de novo judicial trial pursuant to the purported agreement of the parties,

2

we conclude that it did have such authority by agreement, and that the record reflects that the agreement was authorized and/or ratified. Over more than a year, appellants actively participated in pretrial proceedings, including filing a pretrial motion affirming that they had stipulated to trial, and proceeded with trial to judgment before ever contending that appellants never consented to their attorney's agreement to a trial de novo. By remaining silent and participating in the pretrial and trial proceedings without objection, the appellants' agreement to vacate the award and proceed to a bench trial constituted a ratification of these proceedings and waiver of their right to arbitration.

On all other grounds related to the trial judgment, we affirm the judgment entered for the reasons stated below.

## FACTUAL AND PROCEDURAL HISTORY

### I. Factual Background

#### A. Song and Lee form two entities to jointly invest in Coffee Bean franchises

Appellant Dong Yeoun Lee is the sole shareholder and CEO of appellant Creative Global Investment, Inc. (CGI), which owns Coffee Bean and Tea Leaf (Coffee Bean) franchises in Asia and California. Respondent Bryan Song is a businessman who owns and manages a liquor store and a karaoke cafe in Los Angeles. Lee and Song met each other in early 2015 through attending the same health club, began a friendly social relationship, and discussed investing in Coffee Bean franchises together.

Lee and Song ultimately agreed that CGI and Song would jointly form two new companies, CGI Gaju, LLC (Gaju) and CGI Paramount, LLC (Paramount), to open new Coffee Bean franchises in Los Angeles (the Gaju location and the Paramount

location).  Lee told Song that they would be co-owners of each franchise through the LLCs.  When asked about income and profits, Lee represented to Song that Song "would be able to take at least 2 percent of [his] investment every month."  Lee told Song that he was very happy to have met someone like Song and suggested that they become "brothers," meaning that they "would share everything."

In March 2015, Song and CGI entered into an investment agreement governing Gaju, written in Korean.  Among other things, it required Song to invest $450,000, for which he would receive 49 percent of Gaju's stock and 50 percent of its net income, and obligated CGI to pay any expenses in excess of $450,000 prior to the store's opening.  Song provided Lee with separate payments of $200,000 and $250,000 for his required investment in Gaju, for which Lee gave him written receipts.  The Gaju investment agreement also provided Song would pay CGI a $50,000 finder's fee, which Song also paid; however, this $50,000 was ultimately applied toward Song's investment in Paramount.

Based on their prior discussions, Song understood the Gaju investment agreement to mean that CGI and Song would form a new company, which would be the owner of the Gaju Coffee Bean franchise.  Song completed a franchise application form with his personal information and provided it to Lee, who subsequently told him it had been approved.  The Gaju location opened in December 2015.

In February 2016, CGI and Song entered into an operating agreement for Gaju drafted by Lee's lawyer, written in English.  The operating agreement specified that CGI was required to provide "Labor and $300,000" and Song was required to provide

4

$450,000 as capital contributions for Gaju.  Song and CGI were each entitled to 50 percent of net profits.  Lee admitted that CGI never made its required $300,000 financial investment:  He initially testified at deposition that CGI never put any money into Gaju, and at trial testified that he had invested $60,000.

In February 2016, CGI and Song also entered into an investment agreement and an operating agreement governing Paramount.  The investment agreement provided that Song would invest $450,000 in Paramount and receive 39 percent of the stock while a third nonparty investor, The Korea Daily, would invest $100,000 and receive 10 percent of the stock; and a nonparty named individual would receive 17.5 percent of the net income for working as the store manager.  Lee told Song that the franchise agreement for the Paramount location would be held by the Paramount LLC.

The Paramount operating agreement was identical to the Gaju operating agreement except that CGI would hold 51 percent of Paramount's shares, Song would hold 39 percent, and The Korea Daily would hold 10 percent; CGI would contribute $450,000 and labor, while Song and The Korea Daily would contribute $450,000 and $100,000, respectively, and CGI and Song would each receive a 45 percent interest while The Korea Daily would be allocated the remaining 10 percent interest.  The Paramount location opened in July 2016.  Song paid Lee $400,000 in cash for his investment in Paramount, for which he received no signed receipt.  Lee also applied $50,000 Song had previously given him toward his investment in Paramount, and provided a receipt.

CGI entered into franchise agreements with Coffee Bean for the two stores on April 15, 2015, and June 1, 2016,

respectively.  Song, Gaju, and Paramount were not parties to the franchise agreements, thus only CGI had an actual ownership interest in the franchises.  Song never received any return on his investments.

The personal and financial relationship between the two men was complicated in late 2015 by an apparent straw buyer scheme for Song to advance funds to Lee to purchase Song's condominium, which was " 'upside down,' " in a " 'short sale,' " after which Song leased the condominium back from Lee.  The relationship between Lee and Song further deteriorated by mid-2016, when they had a physical altercation over repayment of other unrelated business funds advanced to Lee by Song, resulting in a restraining order against Song.

## B. The arbitration clause and attorney fees provision

The Gaju and Paramount operating agreements each contain the same arbitration clause.  In relevant part, the clause provides:  "13.08. ARBITRATION.  The parties further agree to submit any claim arising out of, relating to, or regarding the validity of, this Agreement in excess of the then current limitation for a small claims matter (presently $5,000.00), to binding arbitration administered by the American Arbitration Association ("AAA") pursuant to the Commercial Rules of the AAA and California law in the County of San Bernardino, State of California, with all expenses being shared equally by the parties, subject to Section 13.03.  This arbitration clause, however, will not deprive the parties of any right they may otherwise have to seek provisional injunctive relief from a court of competent jurisdiction. . . . The parties will ask the arbitrator to limit discovery to the greatest extent possible consistent with basic fairness. . . . The arbitrator will have no power to assess

6

punitive or special damages, legal costs, attorneys' fees, the fees of expert witnesses, unless the arbitrator finds a party to have acted in bad faith and except in accordance with Section 13.03. The arbitrator will not make any award that extends, modifies, or suspends any lawful term of this Agreement. The arbitrator must provide a written arbitration award setting forth the arbitrator's findings of fact and conclusions of law. Judgment on any AAA award may be entered in any court having competent jurisdiction. Any costs incurred in the enforcement of the arbitration award will be paid by the party against whom enforcement is sought."

Section 13.03 of the operating agreements provides that the prevailing party in "any dispute" resulting in arbitration or litigation is entitled to recover reasonable attorney fees, costs, and expenses.

## II. Arbitration and Trial

### A. Song sues CGI and Lee, and arbitration proceeds to a final award of $132,000 for Song

On October 21, 2016, Song filed a complaint against CGI and Lee asserting claims against (1) CGI for breach of contract for failure to make its required capital contributions under Gaju's operating agreement; (2) CGI for breach of contract for failure to make its required capital contributions under Gaju's operating agreement and Paramount's operating agreement; (3) CGI and Lee for intentional misrepresentation for allegedly inflating the amounts needed to construct the Coffee Bean stores so that Song would bear all the necessary costs; (4) CGI for breach of fiduciary duty for failure to make the capital contributions; and (5) CGI for enforcement of inspection rights to review books and records of Gaju. CGI and Lee successfully moved to compel arbitration.

7

On December 8, 2017, the arbitrator issued an award. Among other things, he found that CGI never made any financial contribution to Gaju, that CGI contributed at least $311,150 to Paramount, and that there was no documentary or other credible evidence that Song made any financial contribution to Paramount beyond the $50,000 the parties agreed was credited to him. The arbitrator concluded (1) CGI breached the Gaju operating agreement by not making its capital contribution; (2) CGI did not breach the Paramount operating agreement and substantially performed based on its capital contributions; (3) Song failed to prove CGI and Lee intentionally defrauded him; (4) CGI breached its fiduciary duty to Song by failing to make its required capital contribution to Gaju; and (5) the claim for right of inspection was moot. The arbitrator awarded damages for CGI's breach of the Gaju contract in the amount of $132,000. The arbitrator described this figure as 50 percent of 2016 net income if CGI had made its $300,000 capital contribution, payable under the operating agreement as a distribution of "funds not needed for operations."

## B. CGI and Lee ask the trial court to confirm the arbitration award with modifications

CGI and Lee filed a "Petition/Motion To Confirm Arbitration Award" with the trial court, asking "that the award be confirmed and made into an order, then judgment." The motion included a proposed order to the trial court which "confirmed in all respects" the arbitration award and "entered [judgment] in conformity therewith." But the petition was not a straightforward motion to confirm as it also included "further requests" that the trial court recalculate the extent of Song's percentage interests in the two franchises in proportion to the

capital contribution amounts the arbitrator found were actually made. These further requests were not part of the award.

Song filed a response requesting confirmation of the award without modification, opposing the "further requests" as "contrary to law and public policy" given the presumption in favor of the validity of an arbitration award. Song stated, "As there is no evidence to support any claim of invalidity of the Award, and plaintiff has petitioned this Court to confirm the award, this Court should confirm the Award and disregard defendant's 'further requests.' [¶] . . . [¶] Plaintiff simply requests that the court confirm the arbitration award."

CGI and Lee replied that "[c]ontrary to Plaintiff's claim that petitioner is asking for an invalidity of the award, Petitioner simply asks that the award be confirmed and made into an order, then judgment." The reply reiterated the request "that the Court confirm the Arbitration Award and order that Plaintiff's LLC member percentage interests be adjusted according to the fully integrated Operating Agreements based on Plaintiff's actual capital contribution amounts that were found to have been made, as referenced and concluded by the Arbitrator."

C. **The trial court expresses concern about the clarity and completeness of the arbitration award, vacates the award, and orders a de novo trial pursuant to the agreement of the parties**

At the motion to confirm hearing on April 6, 2018, the trial court issued a minute order stating: "In light of what the court views as serious clarification and/or completeness issues with regard to the arbitration award, the parties are ordered to contact the arbitrator and to try and arrange for further proceedings to be conducted by him" or to obtain a statement

9

from him as to why not.  The trial court set "a further hearing on all matters" for May 23, 2018, unless the parties should give notice of further arbitration proceedings.  No further arbitration proceedings occurred, and no additional statement, motions, or documents were filed with the trial court.  No transcript of the April 6, 2018 hearing was included in the record on appeal.

At the May 23, 2018 hearing, the trial court issued a minute order stating:  "All parties being in agreement the arbitration award is vacated and the case is set for a Court Trial on October 19, 2018."  The order further directed that "[n]o discovery beyond that done already is to take place but arbitration discovery documents products may be used."  There is no transcript of the May 23, 2018 hearing and the minute order is the only record of the proceedings that is included in the record on appeal.

### D. Song amends his complaint before trial

Six weeks before trial was to begin, with new counsel, Song filed an ex parte application to amend his complaint to add a claim for declaratory relief.  CGI and Lee filed an opposition.

The trial court ordered supplemental briefing on whether the causes of action properly belonged to Song or to the LLCs and whether declaratory relief or reformation were necessary to put the issues to rest.  After receiving the supplemental briefing, the trial court granted Song's motion to amend and directed Song to bring most of his claims as derivative claims on behalf of the LLCs and proceed on his own behalf on claims for intentional misrepresentation, breach of fiduciary duty, and enforcement of inspection rights.

Song filed a revised first amended complaint, asserting claims against:  (1) CGI and Gaju for breach of written contract

10

on Gaju's behalf; (2) CGI and Paramount for breach of written contract on Paramount's behalf; (3) CGI and Lee for intentional misrepresentation on Song's behalf; (4) CGI for breach of fiduciary duty on behalf of Song, Gaju, and Paramount; (5) CGI for enforcement of inspection rights on Song's behalf; (6) Lee, CGI, Gaju, and Paramount for rescission based on fraud on Song's behalf; (7) Lee, CGI, Gaju, and Paramount for violation of securities laws entitling Song to rescission; (8) CGI, Gaju, and Paramount for declaratory relief on behalf of Gaju and Paramount; and (9) CGI, Gaju, and Paramount for reformation of contract on behalf of Gaju and Paramount.

On October 12, 2018, CGI and Lee filed an ex parte motion seeking to confirm the trial date, take judicial notice of the arbitration award as to the original third, fourth, and fifth causes of action (misrepresentation, breach of fiduciary duty, and rights of inspection), or, in the alternative, cancel the scheduled trial and/or confirm the arbitration award as to the original third, fourth, and fifth causes of action. The motion represented that "[o]n May 23, 2018, Plaintiff and Defendants agreed to stipulate to vacate the arbitration award in place of a retrial," that "Defendants did agree with the Court in the April 6 motion hearing that the Arbitrator's Award as applied to the First and Second Causes of Action was incomprehensible and unintelligible," and that "Plaintiffs and Defendants had agreed to vacate the Arbitration Award and move forward with a one-time retrial by this Court only because of the incompleteness of and issues remaining in the Arbitrator's Award specifically for the First and Second Causes of Action."

11

At the hearing on the ex parte motion, the trial court continued the trial to January 2019 and ordered an accelerated briefing schedule on the first amended complaint.

**E. The trial court awards Song $900,000 in compensatory damages and $3 million in punitive damages**

The trial court conducted a bench trial in January 2019, from which the issue of punitive damages was bifurcated. The trial court held that Song prevailed on all causes of action except for his claim for enforcement of inspection rights—which he had dismissed—and his request for declaratory relief, which it rejected on the basis that such relief is not proper where an action at law provides an adequate remedy. The trial court awarded Song $900,000 "as to all causes of action" upon which he prevailed.

Song sought $9 million in punitive damages. The trial court conducted the punitive damages phase in March 2019 and awarded Song $3 million in punitive damages. In conjunction with the punitive damages trial, Lee admitted that he had been charged with securities violations in South Korea and placed on probation for two years.

On April 19, 2019, the trial court issued its tentative judgment and proposed statement of decision. The court held Lee was liable for violations of fiduciary duties to Song, breaches of written contracts, intentional misrepresentation, and all other claims alleged other than enforcement of inspection rights and declaratory relief. The trial court found that "while Song was a very credible witness, defendant Lee has and had no credibility whatsoever."

Overall, the trial court "found that Mr. Lee was an experienced and excellent 'flimflammer' who neatly defrauded plaintiff Song. Among other things, he also falsely promised monthly income to plaintiff Song which he knew was never going to be received by Song, and, in pursuit of his goals including but not limited to a goal of inspiring trust and confidence in his expertise and influence in the Coffee Bean franchise business, Lee pursued a phony social relationship with Song and held himself out to be a very wealthy man who was the holder of many franchises with a Coffee Bean company in other parts of the world, worthy of trust, and who, because of his relationship with that company would be able to obtain Coffee Bean franchises for himself and Song as equal 'brothers' to enjoy and share, using a newly created jointly held (Lee and Song, albeit it with Lee's share held by GCI [*sic*]) LLC company for each Coffee Bean location/franchise, with these LLCs, 'owned' jointly by them, that would actually hold the franchise and be the franchisee, etc."

The trial court specifically found that "[t]he LLC companies, purportedly, as represented to Song, to ultimately be the franchisees, were created and Song's money was indeed put into them, albeit the monetary contributions to each required to be forthcoming from Lee were never contributed or invested. Mr. Song's monies were then taken by Lee using his own company CGI which was the designated manager of each of these companies to pay all of the expenses required to open the franchises in issue, but not for the LLCs as franchisees. Instead, they were opened and the Song money used only for Lee's benefit for he never caused the franchises to be 'obtained' by the LLCs. Instead the franchises 'went to' and were solely held and owned by Lee's own company CGI in which Mr. Song and the LLCs held

13

no interest.  Mr. Song was led down a yellow brick road and received nothing in return for his money, much less all that he had been promised and induced to believe he would receive if he would but contribute the money sought by Lee.  [¶]  The bottom line is that plaintiff Song, as intended by Lee at the outset, put up everything and got nothing with Lee and his company, CGI, reaping all of the benefits."

The trial court "determined that the two LLCs discussed in the evidence were also nothing more than additional vehicles set up to defraud Mr. Song by Mr. Lee," and that "Lee simply created and used those LLCs as fraudulent 'shells' and conduits of Song's money to fund the obtaining and opening of a Coffee Bean franchise for himself in the name of his CGI company with no ownership or other interest at all, directly or indirectly reposed in Song."

Accordingly, the trial court concluded that "Song is entitled to a rescission of his dealings and contracts with Lee, the LLCs, and GCI [*sic*] based upon the Civil Code and California common law definitions of fraud and the liability that attaches thereto." The court ordered that Song present a final judgment which includes "a provision that the contracts and membership interests noted above are all rescinded having been induced by fraud with the result that all monies deposited with the companies in issue and obtained by Lee are to be refunded" in the amount of $900,000 plus interest.  In connection with the tort claims, the trial court concluded Lee had acted "egregious[ly]" and therefore imposed $3 million in punitive damages.  Lee filed objections to the statement of decision, which the trial court did not address.

14

The trial court issued judgment against Lee on May 8, 2019.  CGI was not included in the judgment because proceedings against it were stayed when it filed for bankruptcy.

## F. Lee moves for a new trial on grounds including that his attorney agreed to vacate the arbitration award without his consent

On May 31, 2019, Lee moved for a new trial on grounds including that the trial court erred in refusing to confirm the arbitration award and the award of punitive damages was excessive.  The motion asserted that at the May 23, 2018 hearing where the parties purportedly agreed to vacate the arbitration award and proceed to trial "counsel were stunned and silently complied with the court's order, but did not agree to the trial court's action, or to waive their clients'.  [*Sic*.]  At no time were the clients present, nor consulted as to such a change."  The attorney for CGI and Lee declared in a supporting declaration that at the hearing she and Song's prior counsel "were shocked and submitted to our Judge saying she was vacating the binding arbitration award, to which both he and I asked the court to confirm the award.  There were no discussions with clients, Song or Lee, who were not in court on the hearing date.  Frankly, neither [Song's counsel] nor I had such authority."  No supporting declaration from Lee was attached.  The motion asked that the arbitration award be confirmed.

On July 19, 2019, the trial court conducted a hearing on Lee's motion for a new trial and denied it on all grounds except that it agreed that Gaju and Paramount could not be included in the judgment as defendants.  As for Lee's other arguments, the trial court stated that "claims made in support thereof, both as to events that allegedly occurred in the course of the case in

15

Department 12 and as to other matters, this court views as inaccurate." The transcript of the proceedings reflects no discussion concerning Lee's purported lack of consent to the motion to vacate and hold a trial de novo and nothing more than appellants' counsel's arguments and declaration were provided to the court.

Lee filed a timely notice of appeal from the original judgment in July 2019. The trial court entered an amended judgment removing Gaju and Paramount in August 2019. Lee timely appealed from the amended judgment. After the bankruptcy court lifted the stay against CGI, the trial court entered yet another judgment against Lee and CGI. Lee and CGI timely appealed from this third judgment. This court consolidated the three appeals.

## DISCUSSION

### I. Standard of Review

Whether a party consented to or ratified an agreement of their attorney is a question of fact we review for substantial evidence (*Toal v. Tardif* (2009) 178 Cal.App.4th 1208, 1223), as is whether a party waived the right to contractual arbitration (*Lewis v. Fletcher Jones Motor Cars, Inc.* (2012) 205 Cal.App.4th 436, 443). "We infer all necessary findings supported by substantial evidence," and " 'construe any reasonable inference in the manner most favorable to the judgment, resolving all ambiguities to support an affirmance.' " (*Ibid.*) The judgment of the trial court is presumed correct, and "[i]f the trial court's resolution of the factual issue is supported by substantial evidence, it must be affirmed." (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 631–632.)

16

Where a party challenges the sufficiency of the evidence to support a judgment, we also apply the substantial evidence standard of review. (*Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1096.) We review claims of law, and the application of law to facts, de novo. (*Yumori-Kaku v. City of Santa Clara* (2020) 59 Cal.App.5th 385, 409–410.)

## II. The Trial Court Acted with the Parties' Agreement to Conduct a Trial De Novo

### A. The record reflects that the parties stipulated to vacate the arbitration award and proceed with trial de novo

The parties in this case submitted their dispute to an arbitrator pursuant to a written agreement, thus this case involves private, or nonjudicial, arbitration. (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 8; see *Blanton v. Womancare, Inc.* (1985) 38 Cal.3d 396, 401–402 & fn. 5 (*Blanton*) [discussing the differences between judicial and nonjudicial arbitration].) Unlike judicial arbitration, which is nonbinding and offers the opportunity for a de novo trial after arbitration has been completed (Code Civ. Proc., § 1141.20, subd. (b)),[1] private contractual arbitration like that at issue here "is by its essence binding" and "there is no right to de novo trial under the general arbitration statute" (§ 1280 et seq.). (*Thomas J. Porreco v. Red Top Rv Ctr.* (1989) 216 Cal.App.3d 113, 119; see *Mesa Shopping Center-East, LLC v. O Hill* (2014) 232 Cal.App.4th 890, 905 [distinguishing judicial arbitration from "contractual arbitration,

---

[1] Undesignated statutory references are to the Code of Civil Procedure.

17

which is not subject to a de novo trial at the option of the plaintiff"].)[2]

However, as a matter of contract the parties can stipulate to withdraw from arbitration at any time before an arbitration award is confirmed. (See *Byerly v. Sale* (1988) 204 Cal.App.3d 1312, 1315 [judicial system's involvement in private arbitration limited "[b]arring a subsequent stipulation not to arbitrate"]; *Bucur v. Ahmad* (2016) 244 Cal.App.4th 175, 188 [courts may not act on dispute sent to arbitration "absent an agreement to withdraw the controversy from arbitration"].) "Contractual arbitrations are, as their moniker suggests, always a matter of agreement" (*Rivera v. Shivers* (2020) 54 Cal.App.5th 82, 90 (*Rivera*)), an unconfirmed arbitration award "is no more than a contract between the parties to the arbitration" (*Cinel v. Christopher* (2012) 203 Cal.App.4th 759, 765), and the parties to an arbitration are thus free to mutually reject an arbitration award and agree that a judicial officer may conduct a trial de novo.

---

[2] Song relies on section 1141.20 to argue that either party had the right to a de novo trial after the arbitration award, and that appellants' "further requests" of the trial court in their petition to confirm the arbitration award should be construed as rejecting the award and electing trial de novo. However, "[s]ection 1141.20, which gives the parties the right to request a trial de novo within 30 days after an arbitration award, deals with judicial arbitration and is inapplicable to private arbitrations like this one." (*Trabuco Highlands Community Assn. v. Head* (2002) 96 Cal.App.4th 1183, 1191–1192.) By Legislative design, the provisions of the two statutory schemes are " 'mutually exclusive and independent of each other.' " (*Blanton, supra,* 38 Cal.3d at p. 402.)

18

Here, the record reflects an agreement by the parties that the trial court determine the merits of the case by way of a trial de novo, effectively agreeing not to be bound by their contractual arbitration provision. "As a general matter, if a contract provision is subject to arbitration and a party seeks a judicial resolution of a disagreement which falls within the scope of the arbitration agreement, that party waives its right to arbitration." (*Aviation Data, Inc. v. American Express Travel Related Services Co., Inc.* (2007) 152 Cal.App.4th 1522, 1540.) "In the arbitration context, '[t]he term "waiver" has also been used as a shorthand statement for the conclusion that a contractual right to arbitration has been lost.' " (*St. Agnes Medical Center v. PacifiCare of California* (2003) 31 Cal.4th 1187, 1195, fn. 4.) The trial court's May 23, 2018 minute order stated "all parties being in agreement" with the order, reflecting an oral stipulation to vacate the arbitration award and proceed with a bench trial. There was no objection or contrary position stated by appellants for over a year. Indeed, on October 12, 2018, appellants filed an ex parte application to confirm the trial date of October 18, 2018, or to set a new date as soon as possible, which affirmed the prior stipulation of the parties to de novo trial. In that motion, appellants' counsel acknowledged that "Plaintiff and Defendants agreed to stipulate to vacate the arbitration award in place of a retrial," and that "Plaintiffs and Defendants had agreed to vacate the Arbitration Award and move forward with a one-time retrial by this Court" based on appellants' agreement at the April 2018 hearing that the arbitration award was incomplete and unintelligible. At closing argument at trial, appellants' counsel again reiterated that "the arbitrator wrote something incomprehensible."

On its face, this record indicates the parties' mutual agreement to a trial de novo through their attorneys' stipulation, giving the trial court the authority to vacate the arbitration award and proceed with a bench trial. " '[A] stipulation of the attorneys will be presumed to have been authorized by the client' unless the opposing side and the court are aware that the client has not consented to the stipulation." (*Rivera, supra,* 54 Cal.App.5th at p. 91.) Appellants' suggestion that the trial court erroneously sua sponte vacated the arbitration award and conducted a trial de novo, in the absence of any agreement of the parties to do so, is contradicted by the minute order and appellants' own motion papers. Even the new trial motion concedes that Lee's attorney "submitted" without objection to the agreement to proceed with de novo trial. Accordingly, the trial court did not err in accepting counsel's stipulation to the vacation of the arbitration award and de novo trial, as it was only after completing the entire trial and receiving an unfavorable judgment that Lee first sought to repudiate the attorney's stipulation.

## B. Lee and CGI ratified counsel's stipulation to vacation of the arbitration award and de novo trial

Appellants contend that Lee, who was not present at the May 23, 2018 hearing, did not authorize his attorney to enter into any such agreement. In appellants' motion for new trial on May 31, 2019, the attorney for CGI and Lee first declared that at the hearing a year previously she and Song's prior counsel "were shocked and submitted to our Judge saying she was vacating the binding arbitration award, to which both he and I asked the court to confirm the award. There were no discussions with clients, Song or Lee, who were not in court on the hearing date. Frankly,

20

neither [Song's counsel] nor I had such authority." Appellants contend that the trial court's order and resulting trial and judgment are thus void because the purported agreement to vacate the arbitration award and hold a de novo judicial trial was not consented to or authorized by Lee. Song contends that even if the stipulation by appellants' attorney was unauthorized, CGI and Lee ratified it through participating in the subsequent trial and not promptly challenging the trial court's order.

The authority of an attorney to enter into stipulations on behalf of a client is certainly limited. An " 'attorney is authorized by virtue of his employment to bind the client in procedural matters arising during the course of the action' " but he may not " 'impair the client's substantial rights or the cause of action itself.' " (*Blanton, supra,* 38 Cal.3d at pp. 403, 404 [arbitration award void where plaintiff's attorney, without his client's consent, stipulated to submit medical malpractice case to binding arbitration]; e.g., *Sanker v. Brown* (1985) 167 Cal.App.3d 1144, 1145–1146 (*Sanker*) [defendant entitled to vacate judicial arbitration award because he never agreed to his attorney waiving right to trial de novo, even though he agreed to nonbinding arbitration].) Moreover, arbitration is a matter of contractual right, and " '[a]bsent express authority, it is established that an attorney does not have implied plenary authority to enter into contracts on behalf of his client.' " (*Blanton, supra,* 38 Cal.3d at p. 407; *Toal v. Tardif, supra,* 178 Cal.App.4th at p. 1221 ["a party's consent is essential to 'the contractual underpinning of the arbitration procedure' "].)

However, even a client who does not initially provide express consent may be bound by an attorney's unauthorized stipulation if the client ratifies the action. (*Blanton, supra,* 38

21

Cal.3d at pp. 403, 408; *Rivera, supra,* 54 Cal.App.5th at p. 92 ["even an unauthorized act by an attorney concerning substantial rights can be later ratified by the client and thus bind him or her"].) In *Rivera,* for example, an attorney's stipulation to binding arbitration was ratified by the client where "the record shows no evidence either side ever objected to the stipulation or to the arbitration itself" or argued that the stipulation lacked consent. (*Rivera, supra,* 54 Cal.App.5th at p. 92.) The court concluded that "the parties' conduct was always consonant with a binding arbitration, and thus the failure to obtain the clients' signatures on the stipulation was harmless." (*Id.* at p. 93.) Similarly, in *Caro v. Smith* (1997) 59 Cal.App.4th 725 (*Caro*), an attorney's stipulation to binding arbitration was ratified where the client affirmatively acquiesced to arbitration without objection and her attorney "never filed a declaration from [the client] purporting to repudiate her oral agreement to arbitrate." (*Id.* at p. 730.)

Here, the trial court's May 23, 2018 order vacating the arbitration award by agreement of the parties stood without contradiction for more than a year, while Lee actively participated in pretrial proceedings and trial itself. His conduct for over a year was always consonant with agreement for a de novo trial. In *Blanton, supra,* 38 Cal.3d 396, and *Sanker, supra,* 167 Cal.App.3d 1144, in contrast, the clients promptly repudiated their attorney's stipulations to binding arbitration upon learning the nature of the stipulations. Moreover, even in the new trial motion where he finally asserted that his attorney's stipulation was unauthorized, Lee failed to provide his own declaration as to lack of consent. Nothing more was presented to the trial court than the claim in the new trial motion that at the

22

time of the May 23, 2018 hearing Lee's attorney "submitted" to the stipulation to de novo trial without prior discussion with her client. At the hearing on the new trial motion, Lee's lack of consent was not discussed or asserted. As the *Caro* court noted, "[c]lient 'no knowledge' declarations were filed in both *Blanton* . . . and *Sanker*," and in the face of purported lack of client consent a client's "silence says it all." (*Caro, supra,* 59 Cal.App.4th at p. 733 & fn. 3.)

The trial court acted reasonably in relying on counsel's stipulation without protest, and in rejecting Lee's tardily asserted argument that he did not agree to trial. "It is a fundamental rule of appellate procedure that an order will not be disturbed on an appeal prosecuted by a consenting party." (*In re Marriage of Carter* (1971) 19 Cal.App.3d 479, 488.) On any discernable ground, there was consent by agreement. It was only when things went against appellants that the consent issue surfaced. The record reflects a stipulation by consent within the meaning of this rule.

## III. Substantial Evidence Supports the Award of $900,000

Appellants note that the statement of decision refers to both compensatory damages and rescission when discussing the $900,000 award and contend that this is reversible error because Song should have either elected rescission for fraud or damages for breach of contract. "Rescission and damages are alternative remedies," and " '[t]he election of one [remedy] bars recovery under the other.' " (*Wong v. Stoler* (2015) 237 Cal.App.4th 1375, 1385.) "The party may disaffirm the contract, treating it as rescinded, and recover damages resulting from the rescission. [Citation.] Alternatively, the party may affirm the contract,

23

treating it as repudiated, and recover damages for breach of contract or fraud." (*Id.* at p. 1384.)

We conclude that notwithstanding some minor facial ambiguity in the statement of decision and the court's conclusion that the facts supported breach of contract liability, the record is clear that Song elected rescission based on fraud as his chosen remedy. During closing argument, Song's counsel notified the trial court of his client's election to disaffirm the contract and represented that Song "seek[s] recision [*sic*] and restitution" in the sum of $900,000. The statement of decision makes one initial general reference to "the compensatory damages now also awarded against defendant Lee in the sum of $900,000," but the court then specifically found that "Song is entitled to a rescission of his dealings and contracts with Lee, the LLCs, and GCI [*sic*] based upon the Civil Code and California common law definitions of fraud and the liability that attaches thereto," and ordered that Song present a final judgment which includes "a provision that the contracts and membership interests noted above are all rescinded having been induced by fraud with the result that all monies deposited with the companies in issue and obtained by Lee are to be refunded."

Rescission damages are "damages that would restore the plaintiff to the position that she would have been in if had she not entered the contract." (*Akin v. Certain Underwriters at Lloyd's London* (2006) 140 Cal.App.4th 291, 296.) The amount of $900,000 plus interest is thus supported as the return of the total amount Song invested in Gaju and Paramount. Song testified that he paid Lee $450,000 as his investment in Gaju ($50,000 of which was later applied to Paramount), and introduced receipts for these payments. Song also testified that he paid Lee $400,000

24

in cash toward his investment in Paramount. The trial court found Song was a very credible witness, and his testimony constitutes substantial evidence in support of the award.

## IV. The Punitive Damage Award Was Proper

Having concluded that the trial court's $900,000 award was not improper, we next address the award of punitive damages. Appellants contend that the evidence was insufficient to support a punitive damages award and that the award was excessive as a matter of law. We conclude that punitive damages were proper and affirm the trial court's award and determination of the amount of punitive damages.

### A. Substantial evidence supports the trial court's finding that Lee engaged in conduct warranting punitive damages

We review the evidence supporting punitive damages under the substantial evidence standard. (*Stewart v. Union Carbide Corp.* (2010) 190 Cal.App.4th 23, 34.) Punitive damages are permissible on a showing of conduct amounting to "oppression, fraud, or malice." (Civ. Code, § 3294, subd. (a).) Our substantial evidence review proceeds in light of the clear and convincing standard of proof applicable at trial, considering whether the record as a whole contains substantial evidence from which a reasonable trier of fact could have found clear and convincing evidence of " 'oppression, fraud, or malice' that allows for the imposition of punitive damages." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 999; Civ. Code, § 3294, subd. (a).)

There was sufficient evidence in the record that Lee engaged in fraudulent and/or malicious conduct resulting in

Song's harm.[3]  Lee told Song that they would be co-owners of each franchise through the LLCs.  When asked about income and profits, Lee represented to Song that Song "would be able to take at least 2 percent of [his] investment every month."  Lee obtained Song's confidence, told Song that he was very happy to have met someone like Song, and suggested that they become "brothers," meaning that they "would share everything."

To the extent Lee testified to the contrary, the parties agree in their joint settled statement of the punitive damages phase that the trial court rejected Lee's credibility.

Because of Lee's misrepresentations, Song was initially unaware he was not actually a co-owner of either Coffee Bean franchise, that CGI had not made its full required investments, and that the Gaju and Paramount LLCs were purely pass-through entities to shuttle funds to franchises owned solely by CGI.  Song, Gaju, and Paramount were not parties to the franchise agreements, thus only CGI had an actual ownership interest in the franchises.  Song never received any ownership stake or any income on his investments.  Lee's misrepresentations and false promises directly led to Song's harm and constitute sufficient evidence of conduct amounting to oppression, fraud, or malice to support punitive damages.

---

[3] Our conclusion that there was substantial evidence from which a reasonable trier of fact could have found clear and convincing evidence of " 'oppression, fraud, or malice' " is unaffected by the trial court's incidental use of the phrase "preponderance of the evidence" at the punitive damages phase of trial.

## B. The punitive damages award was not excessive

"The purpose of punitive damages is to punish wrongdoers and thereby deter the commission of wrongful acts." (*Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 928, fn. 13; *Zaxis Wireless Communications v. Motor Sound Corp.* (2001) 89 Cal.App.4th 577, 581.) "The function of punitive damages is not served if the defendant is wealthy enough to pay the award without feeling economic pain." (*Zaxis,* at p. 581.) However, the amount of the award must not exceed the level necessary to punish and deter. (*Adams v. Murakami* (1991) 54 Cal.3d 105, 110.) "In determining whether a punitive damages award is excessive, the Supreme Court has set forth three factors to guide us: (1) the reprehensibility of the defendant's conduct; (2) the actual harm suffered; and (3) the wealth of the defendant." (*Zaxis,* at pp. 581–582, citing *Neal v. Farmers Ins. Exchange,* at p. 928.) An award may be reasonable in light of the first two factors but so disproportionate to the defendant's ability to pay that the award is excessive for that reason alone. (*Adams v. Murakami,* at p. 111.)

Although appellants primarily address the third factor, the relationship of the amount of punitive damages to Lee's wealth, here, the actual harm to Song was the loss of $900,000 with no actual ownership interest in either franchise as he had been led to believe. Although the harm was not physical or in disregard of health or safety, Lee accomplished the relevant harm by obtaining the confidence of and financially targeting his purported friend Song, who considered him like a "brother." There is evidence that he convinced Song to invest $900,000 in the LLCs for Lee and CGI's sole benefit through intentional deceit, including representing to Song that Song would be a co-

owner of the franchises, that Lee via CGI would also invest substantial sums of money in the LLCs, and that Song would receive monthly income from his investment.  Although Lee promised under the operating agreements to pay, he did not, and he obscured the true nature of the LLCs as mere pass-through investment entities.  The making of intentionally false representations and promises indicates intentional deceit rather than " 'mere accident.' " (*Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1181.)  Lee's affirmative misrepresentations and false promises show he was not merely indifferent to, but actively sought to injure Song's rights.  Overall, Lee's conduct displayed moderate reprehensibility with the award reasonable in light of the harm and level of reprehensibility.

The $3 million punitive damages award is not excessive in light of the evidence provided of Lee's ability to pay.  Lee testified at deposition that he had dozens of Coffee Bean stores in Cambodia, Thailand, China, and Southern California, residence equity of more than $3 million in a luxury home he had lived in for over 30 years, and conceded that he was required to show a net worth of at least $5 million to be a Coffee Bean franchisee.  The trial court also noted that he held himself out to be "a multi-million-dollar person," and that just days before Lee had represented in an e-mail to a real estate broker that he had money to invest in a new commercial property for another Los Angeles Coffee Bean franchise.  "There is no formula based on net worth for determining what amount is too much.  The fundamental underlying principle is that punitive damages must not be so large they destroy the defendant." (*Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 625.)  Given the evidence of Lee's

wealth there is no indication that this award will destroy Lee economically.

Lee testified that his net worth was minimal and presented bank records showing he had little money in his accounts. He also stated that his interest in the Asian Coffee Bean stores was only 1 percent each and that he had lied at deposition when he said he owned them. However, as already noted, the trial court found Lee not credible. Accordingly, we will not disturb the court's determination.

Finding no error, we affirm the trial court's award of punitive damages.

## V.     The Fee Award Was Proper

The trial court awarded Song $86,583 in attorney fees. "In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs." (Civ. Code, § 1717, subd. (a).)

Appellants argue that the fee award is improper to the extent it was based on the attorney fees provision in section 13.03 of the operating agreements because Lee's alleged fraud, if it occurred, rendered the agreements invalid and incapable of being breached despite the trial court's finding that Song prevailed on all breach claims. We reject this argument and conclude that Song's action was an action "on the contract" for purposes of Civil Code section 1717. In any event, to the extent appellants' argument rests on the proposition that the trial court

substantively invalidated the agreements in tort, the fees provision provides that fees are available in "any dispute" between the parties that resulted in arbitration or litigation, thus the fee award would be supported either way.  "[A] broadly phrased contractual attorney fee provision may support an award to the prevailing party in a tort action," and " ' " '[p]arties may validly agree that the prevailing party will be awarded attorney fees incurred in any litigation between themselves, whether such litigation sounds in tort or in contract.' " ' " (*Gil v. Mansano* (2004) 121 Cal.App.4th 739, 743; see also *Hastings v. Matlock* (1985) 171 Cal.App.3d 826, 841 ["In an action to enforce the rescission of a written land sale agreement, containing a clause for attorney's fees which does not limit recovery of such fees to any particular form of action involving the contract, the prevailing party is entitled to an award of such fees"].)

## DISPOSITION

The judgment is affirmed.  Costs are awarded to Song.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:


ASHMANN-GERST, J.


CHAVEZ, J.